**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**UNITED STATES OF AMERICA,**

     v.                                              **Criminal Case No. 3:23cr114**

**BRANDON RASHAAD HILL,**

     **Defendant.**

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendant Brandon Rashaad Hill's Motion to Dismiss the Indictment (the "Motion"). (ECF No. 15.) In the Motion, Mr. Hill contends that his indictment under 18 U.S.C. § 922(g)(1)[1] is unconstitutional both facially and as applied to him because it "violates his Second Amendment right to keep and bear arms." (ECF No. 15, at 1.) In doing so, Mr. Hill joins hundreds of criminal defendants challenging—pursuant to the June 2022 United States Supreme Court decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and the Second Amendment to the United States Constitution— various laws articulating prohibitions or restrictions regarding guns.

---

[1] Section 922(g)(1) provides:

(g) It shall be unlawful for any person—

> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>      \*      \*      \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, a firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

Mr. Hill asks the Court to dismiss the indictment against him for Possession of a Firearm and Ammunition by a Convicted Felon. (ECF No. 15, at 2.)  For the reasons that follow, the Court will deny the Motion. (ECF No. 15.)

## I.  Factual and Procedural Background

### A.    Factual Background

"On May 2, 2023, officers were patrolling the 3000 block of Dill Avenue when they saw Mr. Hill jogging down the street." (ECF No. 15, at 2.)  Mr. Hill "appeared to be holding his waistband and had a laceration on the back of his neck." (ECF No. 15, at 2.)  When "officers pulled up next to [Mr. Hill] to check on him, . . . [Mr.] Hill continued jogging and turned down Front Street." (ECF No. 15, at 2.)  The officers then "sped up, pull[ed] ahead of Mr. Hill, came to an abrupt stop at an angle, and chased Mr. Hill on foot." (ECF No. 15, at 2.)  While continuing to jog away from the officers, Mr. Hill "appeared to toss something over a fence to his right." (ECF No. 15, at 2.)

"The officers eventually forced Mr. Hill to the ground and arrested him." (ECF No. 15, at 2.)  The "[o]fficers called EMS and took [Mr.] Hill to a nearby hospital for treatment." (ECF No. 17, at 2.)  "One of the officers scaled the fence and saw a handgun on the ground." (ECF No. 15, at 2.)  An officer "recovered a loaded black and silver Ruger SR1911 handgun" near where the officers "observed [Mr.] Hill toss it." (ECF No. 17, at 2.)  Mr. Hill was found to have outstanding warrants and to be a convicted felon.[2] (ECF No. 17, at 2.)

---

[2] The majority of courts addressing *Bruen* issues describe the underlying felony or felonies at issue.  As a juvenile, Mr. Hill incurred four felony convictions, two apparently involving violent conduct. (ECF No. 10, at 3–4.)  Mr. Hill later acquired four felony convictions as an adult.  First, on March 17, 2015, Mr. Hill was sentenced to 5 years suspended for "Failure to Appear on Felony Charge". (ECF No. 10, at 5.)  Second, on March 27, 2015, Mr. Hill was sentenced to 5 years with 3 years suspended for "Possess[ion] of a Firearm by Felon". (ECF No.

### B.     Procedural Background

On September 6, 2023, a Grand Jury indicted Mr. Hill for knowingly possessing a

firearm and ammunition as a felon in violation of 18 U.S.C. § 922(g)(1).  (ECF No. 15, at 2; ECF

No. 1.)  On October 4, 2023, Mr. Hill moved to dismiss Count One of the Indictment, arguing

that "his prosecution under the indictment violates his Second Amendment right to keep and bear

arms."  (ECF No. 15, at 1; ECF No. 1.)

## II.  Standard of Review

### A.     Motion to Dismiss Indictment Under Fed. R. Crim. P. 12

Federal Rule of Criminal Procedure 12[3] allows parties to "raise by pretrial motion any

defense, objection, or request that the court can determine without a trial on the merits."  Fed. R.

Crim. P. 12(b)(1).  Mr. Hill raises facial and as-applied challenges to the constitutionality of

§ 922(g)(1), arguing that it violates the Second Amendment.  (ECF No. 15, at 1, 6.)  "Fed. R.

---

10, at 4.)  Third and fourth, on May 27, 2015, Mr. Hill was sentenced to 10 years with 8 years
suspended for "Burglary: Enter House to Commit Larceny" and 10 years with 9 years and 6
months suspended for "Grand Larceny".  (ECF No. 10, at 5–6.)  But this information is of no
moment.  Mr. Hill does not contest his felon status, and the Court need not, and will not, address
whether the prohibition on possessing a firearm pertains only to dangerous persons.

[3] Rule 12(b)(1) states:

(b) PRETRIAL MOTIONS.

> (1) *In General.*  A party may raise by pretrial motion any defense,
> objection, or request that the court can determine without a trial on the
> merits.  Rule 47 applies to a pretrial motion.

Fed. R. Crim. P. 12(b)(1).

Crim. P. 12(b)(3)(B)[4] permits a court to dismiss a defective indictment.  An indictment is

defective if it alleges a violation of an unconstitutional statute." *United States v. Brown*, 715 F.

Supp. 2d 688, 689 (E.D. Va. 2010) (citing *In re Civil Rights Cases*, 109 U.S. 3, 8–9 (1883)); *see*

*also United States v. Riley*, 635 F. Supp. 3d 411, 416 (E.D. Va. 2022); *United States v. Lane*, No.

3:23-CR-62 (RCY), 2023 WL 5663084, at *7 (E.D. Va. Aug. 31, 2023); *United States v.*

*Kearney*, No. 4:23-CR-29 (JKW), 2023 WL 3940106, at *1 (E.D. Va. June 9, 2023) (citing

*Riley*, 635 F. Supp. 3d at 416).

### B.    Facial and As-Applied Challenges

"To succeed in a facial constitutional challenge, a movant 'must establish that no set of

circumstances exists under which the [law] would be valid.'" *United States v. Hosford*, 843 F.3d

161, 165 (4th Cir. 2016) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see Wash.*

---

[4] Rule 12(b)(3)(B) states:

(b) PRETRIAL MOTIONS.
    *      *      *
      (3) *Motions That Must Be Made Before Trial*.  The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:
    *      *      *
          (B) a defect in the indictment or information, including;

               (i) joining two or more offenses in the same count (duplicity);

               (ii) charging the same offense in more than one count (multiplicity);

               (iii) lack of specificity;

               (iv) improper joinder; and

               (v) failure to state an offense[.]

Fed. R. Crim. P. 12(b)(3)(B).

*State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (stating that a facial challenge can only succeed when a party shows "that the law is unconstitutional in all of its applications"). "Because of this stringent standard, a facial challenge is perhaps 'the most difficult challenge to mount successfully.'" *Hosford*, 843 F.3d at 165 (quoting *Salerno*, 481 U.S. at 745).

By contrast, "[a]n as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case[.]" *United States v. Mgmt. Consulting, Inc.*, 636 F. Supp. 3d 610, 619 (E.D. Va. 2022). An as-applied challenge must be "based on a developed factual record and the application of a statute to a specific person." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc).

### C. The Second Amendment Challenge

Mr. Hill seeks to dismiss his Indictment because, he argues, the statute under which he is indicted, 18 U.S.C. § 922(g)(1), is unconstitutional both facially and as applied. The Court outlines below the broad parameters of the United States Supreme Court's recent Second Amendment case law.[5]

### 1. The Pre-*Bruen* Framework

The Second Amendment to the Constitution of the United States provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. am. II.

---

[5] The Court also identifies that, in addition to establishing new tests for lower courts to utilize in evaluating Second Amendment challenges, each of the three recent seminal cases includes affirmations, albeit dicta outside the central holding, that no recent jurisprudence seeks to disturb longstanding prohibitions against the possession of firearms, such as felon-in-possession bans.

Over the first two centuries of the Second Amendment's existence, the United States Supreme Court offered little guidance for interpreting the scope of the amendment.[6] This changed in 2008—just fifteen years ago—when the Supreme Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008). Relying on the history of, and language in, the Second Amendment, *Heller* confirmed for the first time that the Second Amendment right to self-defense is an individual rather than a collective right limited to militias. *Id.* at 595. Soon after *Heller*, the Supreme Court determined that the Second Amendment applies to the states and local governments due to the Fourteenth Amendment's incorporation of the Bill of Rights. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). In these cases, the Supreme Court recognized that the Second and Fourteenth Amendments protected an individual's right to possess a firearm in one's home for self-defense.

*Heller* broke new ground by finding that because self-defense was the Second Amendment's "central component", it protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 599, 635 (striking down as unconstitutional laws in the District of Columbia banning individuals from using readily operable firearms, including handguns, inside their homes). *Heller* noted that "[o]f course" the individual right to firearm ownership was not unlimited at the time of the country's founding, "just as the First Amendment's right of free speech was not." *Id.* at 595.

---

[6] Before 2008, the Supreme Court issued three Second Amendment opinions, all of which spoke to collective rights. *See United States v. Cruikshank,* 92 U.S. 542, 553 (1875) (noting that the Second Amendment "has no other effect than to restrict the powers of the national government"); *Presser v. Illinois*, 116 U.S. 252, 253, 264–65 (1886) (upholding the constitutionality of a state law restricting gun ownership for those not involved in the state's formal militia); *United States v. Miller*, 307 U.S. 174, 178 (1939) (upholding the constitutionality of a federal ban on shotguns less than eighteen inches long where there was no evidence to show that the ban had "some reasonable relationship to the preservation or efficiency of a well regulated militia").

After *Heller*, the United States Court of Appeals for the Fourth Circuit, along with the majority of courts of appeals, adopted "a two-part approach to Second Amendment claims[.]" *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). Under this approach, "[t]he first question [was] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* (citation and internal quotation marks omitted). This required a "historical inquiry" into "whether the conduct at issue was understood to be within the scope of the right at the time of the ratification." *Id.* If the conduct at issue was not "understood to be within the scope of the right at the time of the ratification . . . then the challenged law" would be deemed valid. *Id.* (citation omitted). In contrast, if the conduct at issue "was within the scope of the Second Amendment as historically understood", then the Fourth Circuit would "move to the second step of applying an appropriate form of means-end scrutiny." *Id.*

At the second step, courts would apply strict scrutiny to core constitutional rights ("ask[ing] whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest'") and intermediate scrutiny to all other rights (asking "whether the Government can show that the regulation is 'substantially related to the achievement of an important governmental interest'"). *Bruen*, 142 S. Ct. at 2126 (citations omitted). Under this means-end scrutiny, a court would then determine whether the state's interest in the regulation was sufficient to overcome whatever burden the law placed on an individual's Second Amendment right. *Id.*

## 2. The *Bruen* Framework

In *Bruen*, the Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-

7

defense outside the home." 142 U.S. at 2122.  It also found that the second step of the

widespread "two-part approach," *see Chester*, 628 F.3d at 680, "is inconsistent with *Heller*'s

historical approach and its rejection of means-end scrutiny." *Id.* at 2129.  In rejecting the

*Chester* two-part approach, *Bruen* explained that *Heller*'s "methodology centered on [the]

constitutional text and history" of the Second Amendment rather than means-end scrutiny

"whether it came to defining the character of the right . . . , suggesting the outer limits of the

right, or assessing the constitutionality of a particular regulation." *Id.* at 2128–29.

　　After *Bruen*, to analyze a Second Amendment challenge, a court must first consider

whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126.  If it

does, "the Constitution presumptively protects that conduct", and "[t]he government must then

justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of

firearm regulation." *Id.* at 2129–30.  The government may meet that burden by identifying "a

well-established and representative historical analogue." *Id.* at 2133.  This is sometimes called

the text-and-history approach.  Sometimes that inquiry could be "fairly straightforward" when,

for instance, a regulation addresses "a general societal problem that has persisted since the 18[th]

century" because "the lack of a distinctly similar historical regulation addressing the problem"

would be "relevant evidence" that the regulation is "inconsistent with the Second Amendment."[7]

*Id.* at 2131.  When a "more nuanced approach" is required because cases implicate

---

　　[7] The *Bruen* Court strove to guide lower courts in this analysis by stating that "analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check." 142 S. Ct. at 2133.  Courts need identify only a "well-established and representative historical *analogue*, not a historical *twin*.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (instructing courts to look to historical regulations of "sensitive places" to assess the constitutionality of modern-day regulations "in *new* and analogous sensitive places") (emphasis in original).

"unprecedented societal concerns or dramatic technological changes," a court should turn to "at

least two metrics" when evaluating whether the regulation is "relevantly similar under the

Second Amendment: . . . how and why the regulations burden a law-abiding citizen's right to

self-defense." *Id.* at 2132–33.

Although the *Bruen* Court rejected the second step of the two-part *Chester* approach,

*Bruen* confirmed that "[s]tep one of the predominant framework is broadly consistent with

*Heller*, which demands a test rooted in the Second Amendment's text, as informed by history."

*Id.* at 2126–27. *Bruen* concluded that:

> [d]espite the popularity of this two-step approach, it is one step too many.  Step
> one of the predominant framework is broadly consistent with *Heller*, which
> demands a test rooted in the Second Amendment's text, as informed by history.
> But *Heller* and *McDonald* do not support applying means-end scrutiny in the
> Second Amendment context.  Instead, the government must affirmatively prove
> that its firearms regulation is part of the historical tradition that delimits the outer
> bounds of the right to keep and bear arms.

*Id.* at 2127.

In sum, in addition to rejecting means-end scrutiny to Second Amendment challenges,

*Bruen* expanded *Heller* significantly by holding, "consistent with *Heller* and *McDonald*, that the

Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-

defense outside the home." *Id.* at 2122.

### 3. Supreme Court Observations About Felon-in-Possession Laws

Finally, and apart from any other evaluation, post-*Bruen* courts are left to grapple with

the flat pronouncement by several Justices, over time, that longstanding prohibitions against the

possession of firearms by felons should remain undisturbed under *Heller*, *McDonald*, and *Bruen*.

For instance, in *Heller*, the Court recognized that, "[l]ike most rights, the right secured by the

Second Amendment is not unlimited", and later clarified that "nothing in our opinion should be

9

taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

mentally ill, or laws forbidding the carrying of firearms in sensitive places." 554 U.S. at 626.

(Scalia, J.).[8] In *McDonald*, four members of the Court reiterated that "[w]e made it clear in

*Heller* that our holding did not cast doubt on such longstanding regulatory measures as

'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the

carrying of firearms in sensitive places [or other regulations and] [w]e repeat those assurances

here.'" 561 U.S. at 786 (Alito, J.) (quoting *Heller*, 554 U.S. at 626–27).[9]

    *Bruen* affirmed this guidance. Justice Alito's concurrence emphasized that *Bruen*

protects only the rights of "law-abiding residents." 142 S. Ct. at 2157 (Alito, J., concurring).

Justice Kavanaugh, joined by Chief Justice Roberts, echoed that sentiment when emphasizing

that "[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the

possession of firearms by felons." *Id.* at 2162 (Kavanaugh, J., concurring) (internal quotation

marks omitted) (quoting *McDonald*, 561 U.S. at 786 (Alito, J.)). Justice Breyer, joined by

Justices Sotomayor and Kagan, reiterated that observation a third time by identifying that in

*Heller*, the Court declared felon-in-possession statutes to be "presumptively lawful." *Id.* at 2189

(Breyer, J., dissenting). The three-Justice dissent then agreed with Justice Kavanaugh's

concurrence affirming that *Bruen* casts no doubt "on that aspect of *Heller*'s holding." *Id.*

(Breyer, J., dissenting) (citation omitted).

    These statements reveal that, all told, six sitting Supreme Court Justices (and two former

Justices) have explicitly identified that felon-in-possession prohibitions are not eradicated by the

---

[8] Chief Justice Roberts and Justices Kennedy, Thomas, and Alito joined this majority opinion in *Heller*.

[9] Chief Justice Roberts and Justices Scalia and Kennedy joined this part of the *McDonald* opinion.

revised Second Amendment test. Are these pronouncements of law? No. Should they be given

a talismanic effect? No. Is this dicta persuasive in deciding the constitutionality of § 922(g)?

Most certainly.

Although lower courts are not bound by Supreme Court dicta, they are nonetheless

"'obliged to afford [it] great weight.'" *Lane*, 2023 WL 5663084, at *4 (quoting *Hengle v.*

*Treppa*, 19 F.4th 324, 347 (4th Cir. 2021) (further citations and internal quotation marks

omitted)). This is especially true when courts are "grappling with complex legal questions of

first impression . . . so as to ensure the consistent and uniform development and application of

the law." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019). Courts

may not "ignore the Supreme Court's explicit guidance by simply labeling it 'dicta.'" *Lane*,

2023 WL 5663084, at *4 (quoting *Hengle*, 19 F.4th at 346). Still, "the Fourth Circuit has

declined to 'afford[] talismanic effect' to Supreme Court dicta that is 'unaccompanied by any

analysis from which [a lower court] might gain insight into the Court's reasoning.'" *Id.* (quoting

*In re Bateman*, 515 F.3d 272, 282–83 (4th Cir. 2008)).

These wise caveats notwithstanding, the fact that six sitting Justices (and two previous

Justices) expressly declared over a fourteen-year period—even in the absence of analysis—that

felon-in-possession laws remain lawful informs this Court's reading of the "complex legal

question[] of first impression" before it. *See Manning*, 930 F.3d at 282.

### III.  Analysis

Mr. Hill presents both facial and as-applied challenges to the constitutionality of

§ 922(g)(1). However, Hill makes the same argument for both challenges: because his felon

status does not exclude him from "'the people' that the Second Amendment demands must be

allowed to bear arms, . . . [t]he Second Amendment presumptively protects his conduct in

11

possessing a gun and ammunition." (ECF No. 15, at 17.) Hill also argues that "the government will be unable to show that § 922(g)(1) as applied to [] Hill is 'consistent with the Nation's historical tradition of firearm regulation,'" and that the Court accordingly "must dismiss the indictment." (ECF No. 15, at 17 (quoting *Bruen*, 142 S. Ct. at 2130).) Because Mr. Hill argues both challenges in the same way using *Bruen*'s framework, (*see* ECF No. 15, at 6–17), the Court addresses them together.

As previously identified, the Supreme Court calls this Court to consider whether "the Second Amendment's plain text covers an individual's conduct." *See Bruen,* 142 S. Ct. at 2126. If it does, "the Constitution presumptively protects that conduct", and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2126, 2130. The government may meet that burden by identifying "a well-established and representative historical analogue." *Id.* at 2133.

*Bruen* has unleashed a cavalcade of Second Amendment challenges to all subsections of 18 U.S.C. § 922 and has done so in a parade of procedural postures. Never has more ink been spilled over 27 words and three commas in the Constitution. As of the date of this opinion, approximately 1150 cases have examined or cited *Bruen*. Cases Citing *Bruen*, WESTLAW, https://www.westlaw.com (last accessed Nov. 28, 2023).[10] Westlaw reports that 75 of these decisions cast *Bruen* in a negative light. *Id.*[11] Over 25 courts in the Eastern District of Virginia alone have analyzed *Bruen*. *Id.*[12] This Court later explains why and how *Bruen*'s mandated

---

[10] To access this list, navigate to *Bruen*, select the "Citing References" header tab, and then select "Cases" from the "Content Type" sidebar menu.

[11] To access this list, navigate to *Bruen* and select the "Negative Treatment" header tab.

[12] To access this list, navigate to *Bruen*, select the "Citing References" header tab, and then select "E.D. Va." from the "Jurisdiction" drop-down menu in the "Filters" sidebar menu.

historical analysis severely hampers a district court—and the parties—from applying *Bruen* in an intellectually honest or academically reliable fashion. Thankfully, this Court need not fully undertake the *Bruen* analysis to decide the constitutionality of 18 U.S.C. § 922(g)(1).

### A.   Fourth Circuit Case Law Upholding the Constitutionality of § 922(g)(1) Remains Binding on this Court After *Bruen*

Alongside others, this Court finds that two Fourth Circuit cases—*United States v. Moore*, 666 F.3d 313 (4th Cir. 2012), and *United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012)—remain good law even under *Bruen* because *Bruen* did not "specifically reject[]" or "clearly undermine" the reasoning on which they rest. *See Lane*, 2023 WL 5663084, at *5 (citations and internal quotation marks omitted). Under an analytical framework permissible even after *Bruen*, *Moore* and *Pruess* have ruled that § 922(g)(1) is constitutional.

18 U.S.C. § 922(g)(1) makes it "unlawful for any person" convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess "any firearm or ammunition." 18 U.S.C. § 922(g)(1).

Mr. Hill argues that "the Second Amendment's 'plain text' entitles 'the people' to the right to keep and bear arms, and nothing in that text or the Supreme Court's cases holds that felons are not among 'the people'" entitled to Second Amendment protections. (ECF No. 15, at 1.) In doing so, however, Mr. Hill disregards on-point Fourth Circuit case law that expressly upholds the constitutionality of § 922(g)(1), and which does so absent any means-end scrutiny. Mr. Hill does not mention either *Moore* or *Pruess* by name. He merely asserts generally that *Bruen* "upended Second Amendment doctrine, replacing the Fourth Circuit's prior interest-balancing approach with an analysis grounded only in constitutional 'text and history.'" (ECF No. 15, at 1 (quoting *Bruen*, 142 S. Ct. at 2129).)

13

This Court disagrees. "When the Fourth Circuit has not overruled one of its precedents, that precedent (if on point) binds this Court unless a Supreme Court decision has 'specifically rejected' . . . or 'clearly undermined' . . . that precedent." *Lane*, 2023 WL 5663084, at *5 (quoting *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998) and *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011)).

Because the Fourth Circuit has never purported to overrule *Moore* and *Pruess*, the sole issue is whether those cases survive *Bruen*. Specifically, the question is whether *Bruen* "clearly undermined," *Williams*, 155 F.3d at 421, or "specifically rejected," *Qingyun Li*, 666 F.3d at 150, the reasoning on which *Moore* and *Pruess* were based. After a thorough review of all three cases, the Court concludes that *Bruen* did not. As explained below, *Moore* and *Pruess* remain good law because they did not rely on the interest-balancing test explicitly rejected in *Bruen*, but rather on "the historical foundations of the regulation and on *Heller*'s dicta." *See Riley*, 635 F. Supp. 3d at 424. The *Pruess* court explicitly states that both its decision and that in *Moore* were reached "without a full *Chester* analysis." 703 F.3d at 246. Accordingly, *Moore* and *Pruess* bind this Court and guide its disposition of the challenge to the constitutionality of § 922(g)(1).

Before *Bruen*, the Fourth Circuit upheld the constitutionality of § 922(g)(1) facially and as applied in challenges brought by both "violent" and "assertedly non-violent" felons. *See Moore*, 666 F.3d at 317, 320 (rejecting both facial and as-applied challenges to § 922(g)(1) brought by felon with an "extensive and violent criminal history"); *Pruess*, 703 F.3d at 244, 246–47 (rejecting facial and as-applied challenges to § 922(g)(1) where defendant, "an assertedly

non-violent felon", had "repeated violations of the firearms laws, leading to at least twenty prior convictions").[13]

In *Moore*, the Fourth Circuit rejected facial and as-applied constitutional challenges to § 922(g)(1). 666 F.3d at 315. The *Moore* court noted that *Heller* had characterized felon disarmament laws as "presumptively lawful." *Id.* at 317 (citing *Heller*, 554 US. At 626–27 & n.26). The court concluded that the facial challenge could be resolved "fairly quickly" by noting that "clearly there are cases where felon firearm possession is constitutionally limited." *Id.* at 318–19. The court also rejected the as-applied challenge, emphasizing that the defendant "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of *law-abiding, responsible* citizens to use arms in defense of hearth and home.'" *Id.* at 319 (emphasis in original) (quoting *Heller*, 554 U.S. at 635). This backward-looking rationale did not involve a means-end analysis.

In *Pruess*, the Fourth Circuit again rejected both facial and as-applied challenges to § 922(g)(1). 703 F.3d at 244, 245–47. Unlike Moore, Pruess was a non-violent felon who argued that "the Second Amendment protects the rights of non-violent felons to possess ammunition." *Id.* at 245. As in *Moore*, the *Pruess* court stated that *Heller* held that "the Second Amendment confers a right to keep and bear arms 'typically possessed by law-abiding citizens for lawful purposes.'" *Id.* at 245 (quoting *Heller*, 554 U.S. at 625). The *Pruess* court also noted that "[a]mong the firearms regulations specifically enumerated as presumptively lawful in *Heller* are 'longstanding prohibitions on the possession of firearms by felons.'" *Id.* (quoting *Heller*, 554

---

[13] The Fourth Circuit also upheld § 922(g)(1) as constitutional in an unpublished case that carries no precedential value. *See United States v. Brunson*, No. 07–4962, 292 F. App'x 259, *261 (4th Cir. Sept. 11, 2008) (finding that defendant's § 922(g)(1) challenge was "meritless" where *Heller* had "recently upheld the 'longstanding prohibition on the possession of firearms by felons'") (quoting *Heller*, 554 U.S. at 626).

U.S. at 626–27, 627 n.26). The *Pruess* court concluded that this longstanding regulation "could not violate the Second Amendment unless, as applied, it proscribed conduct 'fall[ing] within the category of . . . *law abiding responsible citizens* . . . us[ing] arms in defense of hearth and home.'" *Id.* at 245 (emphasis and alterations in original) (quoting *Moore*, 666 F.3d at 319) (further citations and internal quotation marks omitted). "[A]s in *Moore*," the *Pruess* court "conclude[d] *without a full* Chester *analysis* that Pruess'[s] conduct lies outside the scope of the Second Amendment's protection." *Id.* at 246 (emphasis added).[14]

For purposes of this decision, *Bruen* "specifically rejected" or "clearly undermined" only the means-end scrutiny then-utilized by eleven courts of appeals in the Second Amendment context. *See Bruen*, 142 S. Ct. at 2127. As courts throughout the Fourth Circuit consistently— though not exclusively[15]—have held, *Moore* and *Pruess* remain binding precedent because neither case relied on the means-end scrutiny rejected in *Bruen. See Moore*, 666 F.3d at 316–20; *Pruess*, 703 F.3d at 245–47; *see, e.g., Lane*, 2023 WL 5663084, at *5–*7 & n.9 (rejecting facial and as-applied challenges to § 922(g)(1) where defendant was convicted of felony perjury, and observing that, at the time, "every other district court facing this issue within the Fourth Circuit" has concluded that "*Moore* and *Pruess* remain good and binding law" because they rested on

---

[14] Of interest, in a footnote, the *Pruess* court added that even though it "need not pursue an analysis of the historical scope of the Second Amendment right," it nonetheless explained that "Pruess errs in suggesting that historical sources weigh in his favor" because "[t]he Government offers substantial evidence that the Founders severely limited the right to bear arms, excluding from its protection a broad range of often non-violent individuals and groups deemed 'dangerous.'" 703 F.3d at 246 n.3. This "substantial evidence" seems highly relevant to the *Bruen* requirement that the government meet its burden to demonstrate that the felon-in-possession prohibition is consistent with the Nation's historical tradition of firearm regulation.

[15] This Court is aware of one recently published opinion concluding otherwise. *See United States v. Coleman*, No. 3:22-CR-87 (DJN), 2023 WL 6690935, at *4 (E.D. Va. Oct. 12, 2023) (noting, among other things, that *Moore* and *Pruess* fail to mention the word "text" or conduct a textual inquiry). This remains the minority position.

historical analysis, not means-end balancing) (collecting cases); *Riley*, 635 F. Supp. 3d at 424

("The Fourth Circuit's binding authority on this topic did not reach its conclusion upholding the

constitutionality of § 922(g)(1) by conducting a means-end analysis."); *United States v. Spencer*,

No. 2:22-CR-106 (ALWA), 2022 WL 17585782, at *4 (E.D. Va. Dec. 12, 2022) (quoting *Riley*,

635 F. Supp. 3d at 424).

**B.      Applying *Bruen* Would Lead to the Same Result Because the Second Amendment's Plain Text Does Not Extend to Felons**

In the alternative and in the interest of establishing a full record, the Court indicates that

it favors (at least using this limited record) the findings by many courts, including nearly all in

this District, that felons are not included in the Second Amendment's plain text as among

"the people."

As explained in depth below, the Court winces at the notion of making constitutional

proclamations on faulty records or case law that, through no fault of the decision-makers or even

the parties, lack an all-inclusive record.  That said, on this limited record and absent a full

analysis, when independently applying *Bruen*'s standard for Second Amendment challenges to

Mr. Hill's facial and as-applied challenges to § 922(g)(1), this Court would likely come to the

same conclusion about 18 U.S.C. 922(g)(1)'s constitutionality as have the majority of courts in

this District. *See Lane*, 2023 WL 5663084, at *8.  If the Court were required to opine on the

constitutionality of § 922(g)(1) under *Bruen*, this Court would find, on this limited record, that

felons are not covered by the plain text of the Second Amendment because they are not, and

never were, "among 'the people' whose conduct the amendment protects." *See id.* at *8; *see also*

*Riley*, 635 F. Supp. 3d at 424–25 (holding same).

In a plain text analysis, different courts, including the Supreme Court, have defined "the

people" differently.  The primary disagreement is whether "the people" refers to the "national

17

community"[16] or the "political community."[17]  The plain text of the Second Amendment

provides that "the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

amend. II.  *Heller* explained that the term "'the people' . . . unambiguously refers to all members

of the political community."  554 U.S. at 580; *see also Riley*, 635 F. Supp. 3d at 424 ("A plain

reading of the text demonstrates that 'the people' remains limited to those within the political

community and not those classified as felons.").  As other courts have ably noted, *Heller*

repeatedly "described the 'core' of the Second Amendment right as the 'right of *law-abiding,*

*responsible citizens* to use arms in defense of hearth and home.'"  *See Lane*, 2023 WL 5663084,

at *8 (emphasis in original) (quoting *Heller*, 554 U.S. at 634–35) (noting that *Bruen*

"reaffirmed," "reiterate[d]," and "ke[pt] with" *Heller* with regard to its focus on "law-abiding

---

[16] The terms "national community" and "political community" stem from Supreme Court decisions.  In *United States v. Verdugo-Urquidez*, the Supreme Court defined "the people" as 'persons who are part of a national community'" when conducting a *Fourth* Amendment analysis.  494 U.S. 259, 265 (1990).  As noted below, in *Heller*—18 years after *Verdugo-Urquidez*—the Supreme Court described "the people" as "members of the political community" when conducting a *Second* Amendment analysis.  554 U.S. at 580.  Of these two understandings, the latter is the more recent definition and has been reinforced repeatedly since the *Heller* decision.

[17] Courts have persuasively found that "the people" historically referred to members of the "political community" because, among other things, "at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called '*political* rights.'"  *Riley*, 635 F. Supp. 3d at 425 (emphasis added) (legal and academic citations omitted); *see* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (Yale University Press 1998).  *Heller* itself identifies that neither the Second Amendment right to firearm ownership nor the First Amendment right to free speech was unlimited at the time of the nation's founding.  554 U.S. at 594; *see also Bruen*, 142 S. Ct. at 2128 (citing *Heller*, 554 U.S. at 626).  This Court finds that analysis most persuasive.

Other courts have turned to common sense.  For instance, the *Charles* court suggests that excluding felons from "the people" is consistent with the founders' idea of popular sovereignty which gives "the people" the right to govern themselves.  *United States v. Charles*, 633 F. Supp. 3d 874, 888 (W.D. Tx. 2022).  "Put differently" that court says, there is a "right within the Constitution's structure to exclude those who abuse the rights of 'the people.'"  *Id.*

citizens"); *see also Fraser v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, --F. Supp. 3d--, No. 3:22-CV-410 (REP), 2023 WL 3355339, at *9 (E.D. Va. May 10, 2023) (observing that *Bruen* "does deem it 'undisputed' that 'ordinary, law-abiding, adult citizens' are part of 'the people'"). Thus, this Court would agree with others before it that "the people" in that amendment are properly understood to constitute the "political community," from which felons are excluded.

The majority of courts in this District have concluded that felons are not considered a part of "the people" as historically understood. This Court is persuaded by their reasoning. *See, e.g., Riley*, 635 F. Supp. 3d at 424; *Lane*, 2023 WL 5663084, at *10 (providing a detailed discussion of felons' lack of political rights presently and historically and concluding that "[f]elons, systematically stripped of 'political rights', are simply not 'members of the political community'"); *United States v. Finney*, No. 2:23-CR-13 (JKR), 2023 WL 2696203, at *4 (E.D. Va. Mar. 29, 2023) (adopting "the detailed historical analysis undertaken by the court in *Riley*") (citing *Riley*, 635 F. Supp. 3d at 411). This Court recognizes that "[t]his question is the subject of 'ongoing debate.'"[18] *See Lane*, 2023 WL 5663084 at *12 (quoting *United States v. Collette*,

---

[18] At least one Eastern District of Virginia district court has found that the Second Amendment's protections extend to felons by adopting a reading of "the people" that focuses on the national, rather than political, community. *See Coleman*, 2023 WL 6690935, at *6 (rejecting the Government's argument that "felons fall outside of the 'political community,' and thus are beyond the scope of 'the people' protected by the Second Amendment's text" and instead holding that "the Second Amendment applies 'to all members of the national community'").

The *Coleman* court (in addition to its historical analysis) concludes that "the people" include felons because such a reading renders the meaning of "the people" consistent with the First, Fourth, Ninth, and Tenth Amendments. *Id.* at *5. Such a reading, *Coleman* concludes, would adhere to the canon of consistent meaning. *Id.* at *10.

Despite this well-reasoned analysis, examination by other courts reveals that the founders circumscribed the rights of "the people" in both the First and Second Amendments at the time of

630 F. Supp. 3d 841, 848 (W.D. Tex. 2022)). Nevertheless, this Court adopts the conclusion in *Lane* that *Heller* itself defined "the people" in the Second Amendment as the "political community." *See id.* at *12–*13; *see also Fraser*, 2023 WL 3355339, at *9 ("Taken as a whole, Supreme Court precedent teaches that 'the people' comprise all 'members of the political community' . . . which includes, at a minimum, all 'ordinary, law-abiding, adult citizens.'") (citations omitted). Because felons are not a part of the political community, felons would not be covered by the plain text of the Second Amendment.

Because the Court would find at *Bruen* step one that felons are excluded from the reach of the plain text of the Second Amendment, its analysis would end at *Bruen's* first step. The Court need not, and will not, conduct even a hypothetical analysis of "the Nation's historical tradition of firearm regulation" to conclude that § 922(g)(1) does not offend the Second Amendment.[19] *See Bruen*, 142 S. Ct. at 2130.

### IV. Commentary on *Bruen* Analysis

The Court pauses to remark that an accurate and thoughtful reading of 18 U.S.C. § 922(g)(1) under *Bruen* in *any* particular case or controversy is encumbered by the variation among records from which district courts must rule, speedy trial concerns, and the nebulous meaning of phrases such as longstanding "societal problems," "unprecedented societal

---

passage. For instance, the First Amendment gave "the people" the right to vote in elections for the House of Representatives. U.S. Const. art. 1, § 2; *Riley*, 635 F. Supp. 3d at 425; *Lane*, 2023 WL 5663084, at *11; *see also Heller*, 554 U.S. at 595; *Bruen*, 142 S. Ct. at 2130–2131. The right to vote has been circumscribed from day one by gender, by race, by wealth, and by status. It clearly covers a subset of the national community. That said, for the reasons stated above, this Court's commentary is just an observation.

[19] Although it need not say so, the Court finds persuasive the many observations by Justices of the Supreme Court that neither *Heller*, *McDonald*, nor *Bruen* alter the longstanding tradition of disarming felons.

concerns," and "comparable burden."  The analysis is further clouded by the sheer number of possible challenges to § 922 in a panoply of contexts with respect to § 922(g)'s nine sub-sections.[20]

In short, the *Bruen* test defies an intellectually accurate application that would ensure "the consistent and uniform development and application of the law."[21]  *See Manning*, 930 F.3d at 282.  Of course, this Court cannot, and will not, do anything other than follow binding Fourth Circuit precedent and *Bruen* dictates when deciding a case, so these comments are observational only.

A.   **Arguments About the *Bruen* Test Before this Court**

This Court feels compelled to offer, respectfully, insight as to what lower courts must grapple with when reviewing a Second Amendment *Bruen* challenge because the *Bruen* dictates likely will defy consistent application and will create unreliable and confusing law.  Because the

---

[20] For example, *Fraser* considered a challenge to the constitutionality of § 922(b)(1) which limits the sale of firearms or ammunition to those over the age of eighteen.  2023 WL 3355339, at *2.  *Riley* considered a challenge to the constitutionality of § 922(g)(1), which prohibits the possession of firearms or ammunition by a person convicted of a felony that carries a possible prison sentence greater than one year.  635 F. Supp. 3d at 413.  *Lane* considered challenges to both § 922(g)(1) and § 922(o) which prohibits the possession of a machinegun. 2023 WL 5663084, at *1.  *Jackson* considered a challenge to § 922(n) which prohibits the possession of firearms or ammunition by someone under indictment for an offense punishable by imprisonment for a term of one year or more.  2023 WL 2499856, at *1.  *United States v. Rahimi* considered a challenge to § 922(g)(8), which prohibits the possession of firearms by someone subject to a domestic violence restraining order, 61 F.4th 443, 448 (5th Cir. 2023).  Is one court's analysis of the nation's historical tradition of firearm regulation as to felons relevant or applicable to another court's examination of the historical tradition of firearm regulation of unlawful or addicted users of controlled substances?

[21] While the *Bruen* Court uses deliberately broad tests to neither "straitjacket" a court's analysis, nor to give a "regulatory blank check," this Court cannot but find that these terms are unmanageable.  Even the *Bruen* Court's attempt to clarify that "analogical reasoning requires only" a "well-established and representative historical *analogue*, not a historical *twin*," proffers direction that, given its generalized nature, is difficult to follow.  *See* 142 S. Ct. at 2133 (emphasis in original).

historical analysis demanded by *Bruen* does not rest on "unassailable" historical facts (such as

the date the Declaration of Independence was signed), any *Bruen* analysis must address historical

facts that remain subject to debate. *United States v. Jackson*, -- F. Supp. 3d --, 2023 WL

2499856, at *11 (D. Md. Mar. 13, 2023). "[H]istorians continue to explore, discover, interpret,

and *disagree* about more complex historical matters, including the Founders' intent." *Id.*

(emphasis in original).

With a nod to Cervantes and at the risk of tilting at windmills, the Court outlines the

"new experience" it had in this case when struggling to apply *Bruen* in order to explain its

concerns.[22]  First, the Court addresses the arguments in the parties' well-reasoned briefs.  A

sampling of the parties' primary arguments and the support invoked to justify them highlights the

unwieldy rubric *Bruen* creates.

### 1.    Mr. Hill's Position

Mr. Hill presents 18 pages of legal argument.  At *Bruen* step one, he cites cases ruling

that, under a plain text analysis of the Second Amendment, "the people" are part of a "national

community" of "all Americans" and that "the people" has a consistent meaning "in the First,

---

[22] With respect, these difficulties could suggest that lower courts would benefit from some modification or clarification of the *Bruen* test.  When struggling with how to apply *Bruen* fairly, the Court uncomfortably recalled a similar circumstance in which the Supreme Court introduced a mandatory two-step analysis into the test for qualified immunity in *Saucier v. Katz*, 533 U.S. 194 (2001), only to reject that analysis eight years later after finding that it "defied consistent application by the lower courts." *See Pearson v. Callahan,* 555 U.S. 223, 235 (2009). *Pearson* noted the "considerable body of new experience" in the eight years after *Saucier* that showed, among other things, that many courts had questioned the rule (just as the 75 cases casting *Bruen* in a negative light do here). *Id.* at 234–35.

Given that the Second Amendment jurisprudence we address "enshrines an individual right" that developed in 2008 under *Heller*—meaning it "is younger than Twitter [X], Facebook, or YouTube"—a tweaking of this test based on new experience would not necessarily be transformational. *See Charles,* 633 F. Supp. 3d at 887.

Fourth, and Ninth Amendments." (ECF No. 15, at 2, 6–11 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).) Among other sources, Mr. Hill addresses several cases (or dissents)—none of which are in the Fourth Circuit—that say the same. (ECF No. 15, at 6–11.)

At *Bruen* step two, when evaluating the existence of a historical analogue, Mr. Hill cites three law review articles to argue that no "distinctly similar" laws forbidding felons from possessing firearms that would be a historical analogue can be found. (ECF No. 15, at 12–13.) Mr. Hill attaches founding-era Militia statutes from eight states, (ECF Nos. 15, 15-1, 15-2), arguing that these and other statutes enacted just before or after the Second Amendment was adopted show that felons were not prevented from possessing firearms at that time. (ECF No. 15, at 16.) This is true, Mr. Hill argues, because the statutes excluded many able-bodied white men ages 18 to 45 (such as custom-house officers, ferrymen, or Quakers) from service in the militia but, importantly, they did not exclude felons. (ECF No. 15, at 15–17; *see e.g.*, ECF No. 15-2, at 35 (Pennsylvania), 64 (New York), 77, 80 (Georgia).) More on point, each statute required militia members to self-arm and identified specific weapons to possess—indicating that not only did the "the people" have the right to possess weapons on paper, but they actually did possess weapons in practice.[23]

### 2.   The Position of the United States

The United States submits a contradictory record. Before reaching its *Bruen* analysis, the Government posits that *Pruess* and *Moore* bind this Court. (ECF No. 17, at 2–7.) In its 30-page brief, the Government then marches through a plain text analysis of why "the people" refers to

---

[23] *See, e.g.*, ECF No. 15-2, at 4, 12 (Pennsylvania), 42 (Massachusetts), 60 (New York), 71 (Georgia), 84 (New Hampshire), 92 (Delaware), and 107 (Maryland).

"law-abiding, responsible citizens", emphasizing that *Bruen* and its concurring opinions "define

the Second Amendment as applying to 'law-abiding citizens' at least twenty-one times. (ECF

No. 17, at 10.)  In the alternative, at *Bruen* step two, in order to establish that felon-in-possession

laws have a longstanding tradition of disarming persons who are not law-abiding, the United

States advances a legion of citations from pre-founding, founding, and post-founding documents

that, the Government argues, are "analogous enough to historical regulations to be deemed

'longstanding.'" (ECF No. 17, at 21.)  The Government correctly identifies that *Heller*,

*McDonald*, and *Bruen* all turn to the "law-abiding, responsible citizen" language when assessing

the scope of the Second Amendment. (ECF No. 17, at 9–11, 24.)[24]

This Court cannot regurgitate, much less analyze, every supporting historical document

or event cited in the Government's (much less Mr. Hill's) brief.  However, it provides some

examples to show the breadth of the record the Government sought to establish and to highlight

the difficulty a trial court has—mid-prosecution with a detained defendant—in responsibly

---

[24] Indeed, since briefing in this case closed, the United States Court of Appeals for the Fourth Circuit, in a case not entirely on all fours with this § 922(g)(1) analysis, confirmed that *Bruen* noted that "'the people' whom the Second Amendment protects" includes, at a minimum, "ordinary, law-abiding, adult citizens." *Maryland Shall Issue v. Moore*, --F.4th--, 2023 WL 8043827, at *3–*4 (4th Cir. Nov. 21, 2023) (citing *Bruen*, 142 S. Ct. at 2134) (evaluating a handgun qualification licensing requirement that permitted would-be gun owners to own a handgun eventually, but prohibited citizens "from owning handguns *now*") (emphasis in original).

The *Maryland Shall Issue* decision left open a specific finding on the final scope of "the people," but it did so while paying homage to those courts who "tend to agree that history and tradition support an exception affording legislatures 'the power to prohibit dangerous people from possessing guns.'" 2023 WL 8043827, at *6 (citing *Kanter v. Barr*, 919 F.3d 437, 453–64 (7th Cir. 2019) (Barrett, J., dissenting) and *Folajtar v. Att'y Gen.*, 980 F.3d 897, 913–20 (3d Cir. 2020) (Bibas, J., dissenting)).  Certainly, many courts note that *felons* seeking to possess guns engender a different approach to this analysis than do *non-felons* seeking to own handguns for *lawful* purposes.

reviewing the record with its limited resources and while weighing other factors, such as speedy trial concerns.

All told, the United States presents over 100 citations to support its historical argument. The Government cites pre-founding English laws and customs,[25] American statutes,[26] legislative history and ratifying convention documents,[27] books,[28] letters,[29] analogous manuals near the time

---

[25] For instance, the United States cites six "papers" or "instructions" dating from 1661 to 1938 directing local officials to disarm persons whom they deemed untrustworthy, including those who "disturbed the public Peace." (ECF No. 17, at 16 n.4.) The Government then adds historical papers and documents dating between 1701 and 1905 to support its contention that this practice continued after the adoption of the English Bill of Rights. (ECF No. 17, at 16 n.5.) The United States cites similar documents, dated between 1773 and 1792, which told justices-of-the-peace or their equivalents to disarm loyalists or those who carried arms to spread terror. (ECF No. 17, at 25 n.14.)

[26] For instance, the United States refers to at least nine sources discussing statutes between 1775 and 1902 disarming loyalists and others who would not swear allegiance to the new republic. (ECF No. 17, at 25 n.12.) Among other restrictions, the United States mentions nine statutes passed between 1783 and 1890 that allowed disarmament of dangerous munitions, (ECF No. 17, at 26 n.16), twenty-nine statutes from the 1880s restricting the sale to, or the possession of, firearms by individuals below specified ages, (ECF No. 17, at 26 n.17), and approximately twenty-four nineteenth-century statues restricting the gun rights of "tramps," "vagrants," or "intoxicated" persons, (ECF No. 17, at 27 n.19, n.20). In the aggregate, the Government recites a litany of over 75 state laws passed between 1619 and 1899 in support of its historical argument. (ECF No. 17, n.12–n.22.)

[27] When discussing Pennsylvania's ratifying convention, the United States observes that Samuel Adams unsuccessfully proposed an amendment that the Constitution never be construed to prevent "the people of the United States, who are peaceable citizens, from keeping their own arms." (ECF No. 17, at 19–20.)

[28] The Government cites a 2008 book on the history of the Second Amendment. (ECF No. 17, at 19–20 (citing Stephen J. Halbrook, *The Founders' Second Amendment* 171, 191–93 (2008)).)

[29] The United States supports its position by citing a 1788 letter referring to Adams's amendment included in a different source. (ECF No. 17, at 19–20.)

of the founding,[30] written and spoken commentary,[31] and articles[32] to support what it argues is

the longstanding history that weapon possession pertained to *law-abiding citizens* and not those

distinctly similar to felons today.  The academic record presents additional complications which

are addressed below.

> For at least the three reasons identified below, trial courts simply cannot conduct an
academically rigorous scholarly and *exhaustive* evaluation of these important constitutional
questions while a criminal defendant awaits trial.

**B.    The *Bruen* Test Eludes Consistent and Uniform Development and
Application of the Law in Part Because Judges Are Not Historians**

> First, judges are not the proper persons to undertake the historical evaluation *Bruen*
demands.  In *Bruen*, the Court observed that the "'focus on history . . . comports with how
[courts] assess many constitutional claims.'"  *Jackson*, 2023 WL 2499856, at *9 (quoting *Bruen*,
142 U.S. at 2130).  The *Bruen* Court noted that it is common for a court to "loo[k] to history for
guidance."  *Id.* (quoting *Bruen*, 142 U.S. at 2130) (alteration in original).

> At the same time, the Supreme Court rightly identified that it could not foresee every
question that might arise under the *Bruen* approach.  *See Bruen*, 142 U.S. at 2132.  And the

---

[30] The Government refers to six justice-of-the-peace manuals published between 1708 and 1745 that "recognized that the Militia Act authorized local officials to disarm those they 'judge[d] dangerous.'"  (ECF No. 17, at 16–17 n.6.)

[31] For instance, the United States cites two speeches made in Parliament in 1780 in support of its argument that early English law allowed the government to lawfully disarm citizens who were unfit or too irresponsible to carry arms. (ECF No. 17, at 17 n.8 (noting that Lord Amherst spoke in favor of disarming the "mob" and Lord Stormont supported confiscation of arms from "disorderly" persons).)

[32] The United States cites two 1780 magazine articles that distinguished the "riotous mob" from "citizens of character" when addressing disarmament of persons.  (ECF No. 17, at 17–18 & n.9.)  The Government also turns to an 1856 news article criticizing the confiscation of arms from *peaceable* citizens.  (ECF No. 17, at 22 n.11.)

Supreme Court acknowledged in *Bruen* "that '[h]istorical analysis can be difficult'" and may

require "'nuanced judgments' . . . ." *Id.* at 2130 (quoting *McDonald*, 156 U.S. at 803–04 (Scalia,

J., concurring)); *Jackson*, 2023 WL 2499856, at *9.

But when a district court is called (after a plain text analysis) to turn its analysis into an

*entirely* historical one, the judgments morph from nuanced to, essentially, unattainable.[33]  In

short, the Court has before it, from both parties, extensive legal arguments and wide-ranging

academic and historical documentation.  The parties sought no hearing, nor even oral argument.

They consented to a decision on the written record.  Despite the vast number of seemingly rare or

little-known sources, no party provided (except for the Militia statues) any copy of this vast array

of pre-founding, founding, or post-founding documented basis for their arguments.[34]

But this shows a significant complication in conducting the historical analysis *Bruen*

requires.  While recognizing that it is not the law this Court can or would follow, I nonetheless

join other courts in recognizing Justice Breyer's prescient dissent in *Bruen*.  Justice Breyer

previewed the difficulties in conducting a *Bruen* analysis ultimately encountered by this Court.

He states that "'[c]ourts are, after all, staffed by lawyers, not historians' and '[l]egal experts

---

[33] One district court suggests this is true at the most basic underlying level.  In *United States v. Bullock*, the court observed that "'an overwhelming majority of historians' reject the Supreme Court's most fundamental Second Amendment holding—its 2008 conclusion that the Amendment protects an individual right to bear arms, rather than a collective [one]." --F. Supp. 3d--, 2023 WL 4232309, at *5 (S.D. Miss. June 28, 2023).

Certainly, early Second Amendment jurisprudence held that the Second Amendment articulated the right to bear arms as a collective right rather than an individual one. *See Miller*, 307 U.S. at 178.  But, starting with *Heller*, the Supreme Court expanded its reading of the Amendment, and this Court cannot speak to the *Bullock* court's finding about what the "overwhelming majority of historians" do or do not conclude about the Second Amendment.

[34] The Court did not seek an appendix once it knew that the *Bruen* test would resolve at step one.

typically have little experience answering contested historical questions or applying those answers to resolve contemporary problems.'" *Jackson*, 2023 WL 2499856, at *10 (quoting *Bruen*, 142 U.S. at 2177 (Breyer, J., dissenting)). In his dissent, Justice Breyer asks a series of questions that appreciate a district court's potential difficulty in conducting a historical analysis. He observes that lower courts like this one would experience "especially acute" burdens in conducting the historical analysis *Bruen* requires. *Bruen*, 142 S. Ct. at 2179 (Breyer, J., dissenting). Justice Breyer asks:

> Do lower courts have the research resources necessary to conduct exhaustive historical analysis in every Second Amendment case? What historical regulations and decisions qualify as representative analogues to modern laws? How will judges determine which historians have the better view of close historical questions?

*Id.* at 2177 (Breyer, J., dissenting).

The answer is that trial courts undeniably lack the resources to thoughtfully, much less exhaustively, conduct the *Bruen* analysis demanded of them. This Court's review of only the legal and historical part of the record before it in Part IV.A., *supra*, demonstrates the difficulty in discerning representative analogues. This Court fears it risks making incorrect historical findings because it lacks knowledge about other potentially pivotal historical, academic, or legal information. Worse, this Court fears it risks being unable to make an intellectually honest or academically accurate record—factual or legal—because of its inability to properly evaluate its own record.

C.     **District Courts Must Weigh the Right to a Speedy Public Trial Which Hampers the Extensive Analysis *Bruen* Envisions**

Second, as noted above, district courts must weigh the case or controversies before them while providing due process to all parties. Defendants charged with violating § 922(g) necessarily present with at least one felony conviction. Many are detained pre-trial. In this case,

a United States Magistrate Judge decided under the Bail Reform Act to detain Mr. Hill pending

trial. One cannot understate the tension between *Bruen*'s necessarily thorough historical review

and Mr. Hill's (or any defendant's) speedy trial rights under the Sixth Amendment to the

Constitution[35] and the Speedy Trial Act. *See* 18 U.S.C. § 3161 *et seq.*[36]

Any judge seeks to hear every case and controversy with deference to the law and the

Constitution. Some of the most in-depth historical evaluations of challenged statutes involve

analysis that has taken years to amass. *See, e.g.*, *Duncan v. Bonta*, --F. Supp. 3d--, 2023 WL

6180472 (S.D. Cal. Sept. 22, 2023) and *Miller v. Bonta,* --F. Supp. 3d--, 2023 WL 6929336 (S.D.

Cal. Oct. 19, 2023) (reversing decisions finding California's ban on possessing magazines

holding more than ten rounds, and its Assault Weapons Control Act, unconstitutional after

multiple reviews by the United States Court of Appeals for the Ninth Circuit over a five-year

period).

Mr. Hill's speedy trial rights must also be considered. This Court cannot take years to

reach "the" most accurate historical finding.

**D.     A District Court Record Based Only on the Information Compiled by the
Parties Will Create Inconsistent and Unreliable Law**

A third problem applying *Bruen* involves the requirement that a district court rely only on

the historical record *compiled by the parties*. The *Bruen* Court made clear that the government

bears the burden of proof to "establish the relevant tradition of regulation." *Bruen*, 142 S. Ct. at

---

[35] The Sixth Amendment to the Constitution of the United States provides in relevant
part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial
. . . ." U.S. Const. am. VI.

[36] Although the filing of a motion by the defendant tolls speedy trial, it does not release
the defendant from any pretrial detention in which he or she may be held.

2130, 2135, 2149 n.25. That Court also minimized the difficulty of trial courts resolving "difficult historical questions." *Id.* at 2130 n.6. The Court noted that:

> [t]he job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That "legal inquiry is a refined subset" of a broader "historical inquiry," and it relies on "various evidentiary principles and default rules" to resolve uncertainties. . . . For example, "[i]n our adversarial system of adjudication, we follow the principle of party presentation." . . . *Courts are thus entitled to decide a case based on the historical record compiled by the parties.*

*Id.* (first quotation from W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019); second citation omitted) (first emphasis in original; second emphasis added). These observations, the *Bruen* Court asserted, adequately responded to Justice Breyer's dissent regarding the practicalities of implementing the *Bruen* test. *See id.*

But the course of this case—and that of many others—more closely mirrors Justice Breyer's reflections (again in dissent but nonetheless commonsensical) that "'the difficulties attendant to extensive historical analysis [are] especially acute in the lower courts'" and that "'[l]ower courts—especially district courts—typically have fewer research resources, less assistance from *amici* historians, [] higher caseloads,' [and] fewer law clerks, making them 'ill-equipped to conduct the type of searching historical surveys that the [*Bruen*] Court's approach requires.'" *Jackson*, 2023 WL 2499856, at *10 (quoting *Bruen*, 142 U.S. at 2179 (Breyer, J., dissenting)).

For instance, while deciding *Bruen*, the Supreme Court had "80 amici from Ph.D. historians." *Id.* at *10 (citation and internal quotation marks omitted); *Charles*, 633 F. Supp. 3d at 885–86. The Supreme Court used "over 30 pages" to conduct its "historical analysis" and "review[ed] numerous original sources from over 600 years of English and American history." *Bruen*, 142 U.S. at 2179 (Breyer J., dissenting).

30

*Heller* also "undertook 40 pages of textual and historical analysis and concluded that the Second Amendment's protection of the right to 'keep and bear Arms' historically encompassed an 'individual right to possess and carry weapons in case of confrontation'—that is, for self-defense." *Id.* at 2177 (Breyer, J., dissenting) (quoting *Heller*, 554 U.S. at 592, 651) (contrasting the "equally searching textual and historical inquiry" by Justice Stevens in *Heller*'s dissent which, conversely, concluded "that the term 'bear Arms' was an idiom that protected only the right to 'to use and possess arms in conjunction with service in a well-regulated militia'").

Despite appropriate briefing in this matter, the Court lacks any amici, much less the numerous amicus briefs before the Supreme Court in *Bruen*. This is proper because speedy trial concerns commend a "drastically shorter timetable" than that under which higher courts—also properly—operate. *Charles*, 633 F. Supp. 3d at 885–86; *see also Jackson*, 2023 WL 2499856, at *10. But a district court's trial demands do not facilitate a record on which this Court would want to decide a *Bruen* step two question, should it need to do so.

The entitlement to decide a case based on the historical record compiled by the parties does not quell the Court's misgivings for another reason. When making findings, this Court has a duty to review the record not as *characterized* by the parties, but as *individually* reviewed.

### 1.    The Problems Comparing the Historical Records before the Court

Of course, this Court has before it nothing comparable to the extensive historical and academic information presented to the Supreme Court in *Bruen*. It does not even have the historical record *Fraser* considered.[37] The Court nonetheless encounters a prodigious record.

---

[37] In *Fraser*, an Eastern District of Virginia court reviewed two amicus briefs in a challenge to the constitutionality of federal laws delimiting age restrictions on the purchase of firearms. 2023 WL 3355339. No speedy trial concerns existed in *Fraser*.

a.    **Inconsistencies Created by Divergent Readings of Historical Laws, Books, and Other Contemporaneous Documents**

The number of traditionally legal citations presented by the United States for its historical argument—especially given the age of many of the citations—cannot be reviewed with intellectual integrity when balanced against speedy trial dictates. The Government's cited materials—including a list of 180 district court opinions that have rejected a post-*Bruen* challenge to the constitutionality of § 922(g) based on historical laws, books, and other contemporaneous documents—hew toward *Heller* and *McDonald* in finding that the Second Amendment, historically, has applied only to "law abiding, responsible" citizens. (ECF Nos. 17, 17-1.)

Mr. Hill also relies on far more than the founding-era Militia Acts from eight states that he attaches to his brief. (ECF Nos. 15, 15-1, 15-2.) As to the Acts, Mr. Hill argues that these and other statutes, enacted just before or after the Second Amendment was adopted, show that felons were not prevented from possessing firearms at that time. (ECF No. 15, at 6–17.) As noted above, Mr. Hill argues that this is true because the Militia Acts excepted certain groups from serving, but there is no historical analogue act or law that similarly excepted felons. Mr. Hill also thoughtfully discusses numerous appellate and district court cases, none of which fall in the Fourth Circuit or the Eastern District of Virginia, to support his arguments.[38]

---

[38] *See* ECF No. 15, at 8–11, 13. The out-of-circuit cases neither bind nor persuade this Court. *See, e.g.*, *Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*). This Court's historical record outshines that in *Range*, and, factually, *Range* involved a less dangerous felony—making a false statement in violation of Pennsylvania law—than those at issue here. *Id.* at 98.

b.   __Inconsistencies Created by Incompatible Academic Records__

Many of the cases relied upon by the parties rely on academic sources, or cases that cite

academic sources, when making their findings. The reliance on academic analyses presents even

more troubling concerns. *See Bruen*, 142 S. Ct. at 2180 (Breyer, J., dissenting) ("The extent to

which colonial statutes enacted over 200 years ago were actually enforced . . . and the

interpretation of English laws from the Middle Ages . . . are often less than clear" and "even

historical experts . . . reach conflicting conclusions based on the same sources.")

Mr. Hill, when evaluating the existence of a historical analogue, cites numerous appellate

and district court cases alongside three law review articles to argue that no "distinctly similar"

laws forbidding felons from possessing firearms that would be a historical analogue can be

found. (ECF No. 15, at 12–13.) According to Mr. Hill, these sources demonstrate that the

Second Amendment applies to "the people" and not the more circumscribed group of "law-

abiding, responsible" citizens. (*See, e.g.*, ECF No. 15, at 13–15.) Under that historical

interpretation, felons would be included among those retaining Second Amendment rights.

Unsurprisingly, the United States similarly cites numerous appellate and district court

cases alongside seemingly equally reputable law review articles and other sources whose

historical analysis finds the opposite. (*See, e.g.*, ECF No. 17, at 11–12, 19.) Indeed, the United

States turns here to no fewer than ten law review articles in support of its plain text and historical

arguments. (ECF No. 17, at 11–19.)

Interpreting case law is this Court's job.  But interpreting case law including other

judges' historical analyses is trickier.  The cases conducting historical analyses for Second

Amendment challenges rest on vastly differing records.  Even in this District, several thoughtful

33

judges, without expert historian input, have decided the constitutionality of 18 U.S.C. § 922(g).[39]
Even when in the same procedural posture as that at bar, these cases do not rely on the same
written expert historical analyses and are built on different—perhaps *materially* different—
underlying academic support.

A brief examination of the academic literature cited in this District's decisions
demonstrates why this Court expresses concern about non-uniform records. For example, in
*Coleman*, the court found that "the people" included felons as part of the "national community",
but that § 922(g) was nonetheless constitutional given the "longstanding tradition . . . of
disarming both violent and nonviolent felons" in this country. 2023 WL 6690935, at *15.
Oddly, *Coleman* addressed many decisions, including *Riley*, which found, based on a different
record, the opposite as to the scope of "the people"—*i.e.*, that "the people" referred to the
"political community" and thus excluded felons. 635 F. Supp. 3d at 411.

*Coleman* evaluated five academic articles. 2023 WL 6690935, at *11–*13. *Riley* turned
to ten scholarly articles. 635 F. Supp. 3d at 425–28. *Coleman*'s analysis included only two of
them.[40] Both courts evaluated, as here, a motion to dismiss the indictment. This Court sees

---

[39] *See, e.g.*, *United States v. Riley*, 635 F. Supp. 3d 411 (E.D. Va. 2022); *United States v.
Spencer*, No. 2:22-CR-106 (ALWA), 2022 WL 17585782 (E.D. Va. Dec. 12, 2022); *United States
v. Coleman*, No. 3:22-CR-87 (DJN), 2023 WL 6690935 (E.D. Va. Oct. 12, 2023); *United States v.
Williams*, No. 3:22-CR-158 (HEH), 2023 WL 6368971 (E.D. Va. Sept. 28, 2023); *United States v.
Lane*, No. 3:23-CR-62 (RCY), 2023 WL 5663084 (E.D. Va. Aug. 31, 2023).

[40] *See Coleman*, 2023 WL 6690935, at *11, *13; *Riley*, 635 F. Supp. 3d at 427–28 (citing
Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons From
Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) and Saul Cornell & Nathan DeDino, *A Well
Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506
(2004)).

Both *Coleman* and *Riley* reach the second shared academic authority (the Cornell and
DeDino article) in a derivative fashion, via a Fourth Circuit case that is the *actual* decision

danger in courts potentially cherry-picking "analogous" historical restrictions over those disagreed with, or highlighting law review arguments in some articles and not others simply because they support the outcome the judge desires. *See United States v. Bullock*, --F. Supp. 3d--, 2023 WL 4232309, at *23–*25 (S.D. Miss. June 28, 2023) (noting that many cited authors in *Bruen* cases lack historical training, and that, more than once, the same article has been cited to support opposing conclusions). The supporting academic records in *Coleman* and *Riley* are not the same.[41] To what extent is either precedent to each other, or to this Court? What to make of the three law review articles in *Coleman* that *Riley* does not cite?[42] What implication flows from the fact that *Coleman* does not rely upon seven academic analyses that *Riley* deemed meaningful?[43] What is the upshot of this Court having three resources before it that overlap with *Coleman* and two with *Riley*, but only one that is cited in both? What is this Court to do with the four or so academic offerings that were not before *Coleman*, *Riley*, or many other courts in this District?[44] *Cf. Charles*, 633 F. Supp. 3d at 887 (evaluating the potential outcome of conflicting

---

relying on the academic resource. *See United States v. Capio-Leon*, 701 F.3d 974, 980 (4th Cir. 2012). Courts should review all those sources if only to ensure they are properly summarized— an additional review that requires even more time.

[41] To be clear, the Court does not see that the records differ based on any "cherry-picking" of articles by the *Coleman* and *Riley* courts.

[42] Two articles are written by Don B. Kates, a prolific and oft-cited Second Amendment author and litigator who has represented the National Rifle Association.

[43] Two of those articles are written by Stephen P. Halbrook, a law professor with a doctorate in philosophy who has authored multiple books and articles on the Second Amendment and who authored a brief on behalf of the majority of both houses of Congress in *Heller*.

[44] Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002); Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1586 (2022); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right*, 130–131 (1994); Robert Dowlut, *The*

35

opinions if one government attorney were to bring a case with a detailed record but another government attorney—in the same court—were to present a lesser or wholly inadequate record). Finally, how should the Court evaluate the relative expertise of the various authors, especially those who are not historians by training?[45]

### 4.    The Drawback to Expanding the Record

While the *Bruen* Court counsels addressing only the record presented in the adversarial presentation before any lower court, some courts have asked the parties to identify why they should not hire an independent expert to make the necessary historical finding given the conflicting historical interpretations they must undertake. *See, e.g.*, *Baird v. Bonta*, 644 F. Supp. 3d 726, 738 (E.D. Cal. Dec. 8, 2022) (reversed on other grounds); *Bullock*, 2023 WL 4232309, at *4–*5. At least one court has undertaken the utmost effort to develop extremely detailed records

---

*Right to Arms:  Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 77 n.54 (1983).

[45] For example, consider two of the authors frequently cited by parties arguing a *Bruen* motion.  The first is Professor Akhil Reed Amar, a renowned Yale Law School professor who double majored in history and economics at Yale, teaches constitutional law courses, has written over one hundred law review articles and several books on the Constitution, and has testified before Congress. *Akhil Reed Amar*, YALE LAW SCHOOL, https://law.yale.edu/akhil-reed-amar (last accessed Nov. 28, 2023).

Parties likewise liberally cite the work of C. Kevin Marshall, who, prior to joining Jones Day, served as a deputy assistant attorney general in the U.S. Department of Justice's Office of Legal Counsel, clerked for Justice Thomas and Judge Luttig of the Fourth Circuit, and has testified before Congress. *C. Kevin Marshall*, JONES DAY, https://www.jonesday.com/en/lawyers/m/c-kevin-marshall (last accessed Nov. 28, 2023).  Mr. Marshall's resume is undoubtedly impressive; it also appears to be one of a practitioner or advocate, not of a formal academic, historian, or scholar.

How should this Court or any court weigh the comparative historical expertise, perceived or actual, of the various authors of the academic sources that parties cite to support their *Bruen* analysis?  Is Professor Amar's opinion entitled to more weight than Mr. Marshall's?  On what basis?  If district courts weigh these perspectives differently and arrive at different conclusions as to the constitutionality of § 922 or any other federal firearm law, what result?

via having an evidentiary hearing, reviewing the declaration of experts on more than one topic, reviewing lay witness declarations, looking to data collections, media reports on crimes, and a host of law review and other writings on many topics. *Miller*, 2023 WL 6929336 (assessing, after remand, the constitutionality of the California Assault Weapons Control Act and, under *Bruen*, reversing its 2021 decision and finding that the assault weapon ban unconstitutional). Such efforts may contravene what the *Bruen* Court suggests, but these actions fall well within procedures trial courts routinely undertake to create the necessary record on which to evaluate "complex legal questions of first impression." *See Manning*, 930 F.3d at 282.

This Court questions whether cases built on likely materially different records can ensure the consistent and uniform development and application of the law. *See id.*; *see also Charles*, 633 F. Supp. 3d at 885–86; *Jackson*, 2023 WL 2499856, at *11. Differing records seem inevitable because "historians continue to explore, discover, interpret, and *disagree* about more complex historical matters, including the Founders' intent." *Jackson*, 2023 WL 2499856, at *11 (emphasis in original). And without consistent reliable precedent to build upon, it seems likely that the scores of *Bruen* analyses will defy consistent application, resulting in unreliable and confusing law.

### V. Conclusion

For the foregoing reasons, the Court will deny the Motion to Dismiss. (ECF No. 15.) An appropriate Order shall issue.

Date: 11/28/2023
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge